Allyson N. Ho *(pro hac vice pending)*
Matthew Scorcio *(pro hac vice pending)*
Robert Frey *(pro hac vice pending)*
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
*aho@gibsondunn.com*

Andrew W. Gould
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2555 East Camelback Road, Suite 700
Phoenix, Arizona 85016
Telephone: (602) 388-1262
State Bar No. 013234
*agould@holtzmanvogel.com*

Nathan W. Kellum *(pro hac vice pending)*
FIRST LIBERTY INSTITUTE
699 Oakleaf Office Lane, Suite 107
Memphis, Tennessee 38117
Telephone: (901) 684-5485
*nkellum@firstliberty.org*

David J. Hacker *(pro hac vice pending)*
William G. Bell *(pro hac vice pending)*
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: (972) 941-4444
*dhacker@firstliberty.org*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

David Hoffman,

Plaintiff,

v.

City of Tucson, Officer Matt Alexander in his individual capacity, and Officer William Leonard in his individual capacity,

Defendants.

CASE NO. __________

**COMPLAINT**

## INTRODUCTION

1. The public streets are the United States' oldest and most traditional public forum. And religious evangelism is protected speech. But plaintiff David Hoffman was excluded from sharing his religious beliefs in the public streets, under threat of arrest, at the Winterhaven Festival of Lights—a free event open to the public.

2. Defendants the City of Tucson and its police officers prohibited any "religious" speech and any distribution of "flyers" at the festival. The City purported to make up for it by sending Hoffman to a designated "free expression zone" *outside the festival*. The officers threatened multiple times to arrest Hoffman if he talked about his faith or distributed leaflets inside the festival.

3. The City's policy and the officers' actions were unlawful restrictions on speech under the First Amendment and the Arizona Constitution. When a city grants private users a permit to host an open event in a public forum, any restrictions on speech must be "content neutral," "narrowly tailored" to serve a government interest, and leave open "ample alternative channels of communication." *Gathright v. City of Portland*, 439 F.3d 573, 577 (9th Cir. 2006). Prohibiting "religious" speech is not content-neutral. And stopping conversations or leaflet handouts does not serve any legitimate government interest, much less as a narrowly tailored means to do so. Defendants' policy and actions also unlawfully burdened Hoffman's sincere religious exercise with a

requirement that was not neutral or generally applicable, in violation of the First Amendment and Arizona's Free Exercise of Religion Act.

4. Federal and Arizona law prohibit cities from outlawing speech in public forums—particularly religious speech. The Court should grant declaratory and injunctive relief confirming that Hoffman can speak and hand out leaflets on public streets and rights of way during this year's festival and all future festivals. The Court should also grant nominal damages for the constitutional violations Hoffman suffered at last year's festival.

## JURISDICTION AND VENUE

5. This civil rights action asserts federal claims under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and state-law claims under the Arizona Constitution and the Free Exercise of Religion Act, Ariz. Rev. Stat. Ann. §§ 41-1493–41-1493.04.

6. This Court has original jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343, and it has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the claims brought under federal law.

7. For the federal claims, this Court can grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and for the state-law claims, it can grant the requested relief under Ariz. Rev. Stat. Ann. § 41-1493.01(D) and Ariz. Rev. Stat. Ann. § 12-1831.

8. This Court can award the requested nominal damages under 28 U.S.C. § 1343 and Ariz. Rev. Stat. Ann. § 41-1493.01(D), and it can grant costs and attorney's fees under 42 U.S.C. § 1988 and Ariz. Rev. Stat. Ann. § 41-1493.01(D).

9. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to this complaint occurred within the District.

## THE PARTIES

10. David Hoffman is a Christian evangelist who resides in Arizona.

11. The City of Tucson is a political subdivision of Arizona.

12. Officer Matt Alexander is a Tucson police officer. Hoffman seeks only nominal damages against Officer Alexander.

13. Officer William Leonard is a Tucson police officer. Hoffman seeks only nominal damages against Officer Leonard.

## FACTUAL BACKGROUND

### I. David Hoffman speaks in public to evangelize for Christ.

14. Hoffman has shared his religious beliefs in public around the Country. He sincerely believes that Christians should spread the gospel of Jesus Christ—literally the "good news"—to everyone they can. And he believes the gospel positively changes lives. Considering that, he wants to tell others about the hope he's found in Christ.

15. Hoffman has been evangelizing in public since 2015. Around the same time, he started an evangelistic nonprofit organization that aims to share the gospel across the Country.

16. To reach as many people as possible with his religious beliefs, Hoffman goes to well-attended public events. He has one-on-one conversations with people willing to talk. He also hands out literature at the events, which expands and deepens Hoffman's engagement because it can be faster and more detailed than individual conversations. And Hoffman preaches to those around him. Hoffman tries not to interfere with pedestrian traffic, vendors, or anyone else's speech. Hoffman doesn't seek to offend or shock those he talks to. His focus is spiritual, not political or social. He wants to share the gospel.

17. Hoffman considers his method for spreading the gospel unique and irreplaceable, including because it creates meaningful dialogue. Freedom to speak in public areas where an event's attendees are present for a sustained time is essential. It enables Hoffman to engage other attendees in friendly, persuasive conversations.

**II. The Winterhaven Festival of Lights is a public event on public streets that remain free and open during the event.**

18. The Winterhaven Festival of Lights is held annually in December in the Winterhaven residential neighborhood of Tucson, Arizona. The neighborhood is located in northwest Tucson, bounded by four major public

roads: North Tucson Boulevard to the west; East Prince Road to the north; North Country Club Road to the east; and four-laned East Fort Lowell Road to the south. A smaller frontage road runs parallel to Fort Lowell Road just outside of the North Christmas Avenue entrance into the neighborhood. Multiple businesses across from the neighborhood line these roads.

19. The Winterhaven neighborhood consists of around 265 single family homes. City streets run through the neighborhood and connect to the major roads. East Kleindale Road runs east and west through the neighborhood. It connects North Tucson Boulevard to Country Club Road and also extends beyond the neighborhood across most of the northern Tucson area. North Treat Avenue runs north and south through the neighborhood from Prince Road to Kleindale Road, is interrupted at Kleindale Road, then resumes south of the neighborhood and continues through most of the Tucson area. North Christmas Avenue runs north and south through the neighborhood, connecting Fort Lowell Road to Kleindale Road. The neighborhood is also crossed by other public streets and public alleys.




20. Each December, Winterhaven Festival of Lights invites the general public to walk through the neighborhood to enjoy Christmas and seasonal light displays. The festival receives thousands of visitors per year. Vendors offer food and drinks. No admission fee or ticket is required for entry. As at other times of year, the neighborhood is not closed off to the public during the festival.

21. Along with light displays, some homes play amplified music or host live performances. The festival organizers authorize musical performances and

other entertainers inside the festival. They permit party bikes or pedal pubs, which are large vehicles seating up to fifteen people, and allow them to play amplified music.

22. The City of Tucson provides a non-exclusive use permit for the festival, which authorizes closing the streets to non-residential vehicle traffic. The City places barriers near the primary entrances to the Winterhaven neighborhood as a buffer between vehicular traffic on major roads, like Fort Lowell Road, and pedestrians entering the festival area. The City restricts vehicular traffic during the festival to residents, but pedestrians are free to enter from any street or alley.

23. The City makes policy for the festival through its permitting process. The festival organizers coordinate permit details directly with the city manager's office, including City officials Andy Squire and Joshua Rothschild. The City's legal department is also involved in the permitting process. According to a police officer present at the festival in 2025, the terms of the permit allow the festival organizers to exclude anyone for any reason.

24. With the permit, the City empowers the Winterhaven festival organizers to exclude people because of their speech. And City police officers enforce the exclusions.

25. Hoffman attended and evangelized at the festival for approximately ten years until his exclusion in December 2025. He plans to attend and speak at the festival in December 2026 and in future years.

## III. The City prohibits "[r]eligious" speech and leafleting.

26. In December 2025, the City prohibited religious speech inside the festival. Under this policy, "[r]eligious, political, or issue-based leafleting" is prohibited. Signs posted at the festival prohibited "political, religious, or commercial materials or messaging" and warned that "law enforcement may remove anyone violating" the policy and "[r]efusal to comply may result in trespassing enforcement":




27. In conjunction with its speech prohibitions inside the festival, the City directed would-be speakers to a "free expression zone" outside the festival near the corner of E. Fort Lowell Road and North Christmas Avenue. Signs posted at the festival cited the "City-approved event safety plan" as authority for the "removal" of anyone who was "noncompliant" with the policy:




28. Though the signs stated that "[e]nforcement" wasn't based on "the content of any message," this didn't apply to "[r]eligious, political, or commercial" messages—which the policy prohibited.

## IV. The City and uniformed officers enforce the policy against Hoffman.

29. Hoffman tried to attend the festival with a small group of people on multiple nights in December 2025. Tucson police officers excluded him and threatened him with arrest.

30. When Hoffman entered the festival and talked to people about Jesus, Officer Leonard and other uniformed City police officers approached him to enforce the policy that this message wasn't allowed. Officer Leonard said "[y]ou can't be inside here doing the preaching." Though he wasn't loud, Hoffman asked the officers if his volume was a problem. Officer Leonard said "it's the communicating, it's the sending of your message, which is one of the prohibited rules." Hoffman asked "[c]ould I ask someone if they'd like to discuss Jesus?" Officer Leonard replied, "[n]o, I would say that's still part of the sermonizing," and "once you start sermonizing, that becomes a problem."

31. Hoffman asked if he could talk to people about Jesus in a conversational style. Officer Leonard responded "[t]hat's still a part of the sermonizing." Hoffman asked a hypothetical question—what could he do if someone approached him and asked "[w]hat would I do if I am lost?" Officer Leonard told Hoffman to hold that conversation "outside the program."

32. Officer Leonard and other uniformed City police officers required Hoffman to leave the festival because he'd discussed a prohibited message. "You have been asked to leave tonight. . . . You could be subject to arrest if you are continuing to solicit." Hoffman asked "if I preach while I walk out, will I be arrested?" Officer Leonard said "[y]eah." Four uniformed police officers escorted Hoffman out of the festival.

33. In another instance when police officers confronted Hoffman, he asked for clarification about the policy on the posted signs. A festival organizer who had joined the conversation explained that religious speech was prohibited and that these restrictions were City policy: "It's about like no political, no religious, no nothing. . . . [W]e've had political removed. . . . We've already had some religious removed." "We did get from the City of Tucson. Police told us this is how we do the stuff. . . . [T]his is how all the festivals are now doing." The restrictions were based on past "complaints" during the festival and "[y]ou can call the city manager's office and they will happily give that to you, they aggressively gave that information to us."

34. In another conversation, Officer Alexander told Hoffman he would be arrested if he engaged in religious speech inside the festival. Hoffman asked for more details about the policy: "[s]o if someone were to be inside . . . not distributing anything and just using their voice, would it be an arrest?" Officer Alexander responded that "if you don't leave" when requested, then "I would have to do that" and make the arrest.

35. Skeptical of what seemed like an unusually oppressive restriction on speech, Hoffman inquired further: "I can't totally see [arrest for] just the voice thing." Officer Alexander explained that, under the City's policy, whatever the festival organizers said goes: "what they want is not that. And because of the permit thing I told you about, they get to decide that."

36. Officer Leonard also told Hoffman he would be arrested if he declined to leave or stop his religious speech after a request. "[W]e can make an arrest for trespassing . . . . [i]n the event that Winterhaven asked you guys to leave [and] you guys refuse to leave."

37. Both police officers also confirmed that leafleting was prohibited inside the festival. When Hoffman asked Officer Alexander "[s]o you're saying that somebody could not literally stand over there and hand out Christian literature," Officer Alexander responded that the festival organizers "do not want that" and their wants "supersede everything else because they have a permit from the city." Officer Leonard likewise warned Hoffman that "the distribution of pamphlets is the thing that is prohibited."

38. The police officers confirmed that they were enforcing City policy. Officer Alexander explained that "I clarified through our department, they have gotten a permit from the City of Tucson," so "everything from the barricades in is theirs" to control. When Hoffman asked to see the permit, Officer Alexander responded that "I'm being told that the permit is in effect and I have to be able to rely on other officers and part of my agency in the city."

39. The officers weren't enforcing a private policy. Aside from the officers' repeated statements they were enforcing City policy, the City's Special Event Guidebook also provides that Tucson police officers present at special

events "are there to enforce laws. It is not the responsibility of police officers to provide the services that are the job of private security staff."

40. While Hoffman was censored, performers and vendors were allowed to enter the festival, set up equipment, and communicate their messaging.

41. The City's policy to quarantine Hoffman's religious expression to a "free expression zone" outside of the festival undermines Hoffman's ability to effectively communicate to his intended audience inside the festival. The "free expression zone" was a less effective and less useful place to speak than inside the festival. Rather than talk *to* people who were viewing displays at a relaxed pace, the zone's location outside the festival required Hoffman to talk *at* people who were transiting to get where they wanted to go.

42. It was difficult to reach even the people who were present near the zone. The zone keeps Hoffman separated from people walking on the public sidewalk. Noise, including from traffic on Fort Lowell Road, forces Hoffman to shout and raise his voice, undermining his conversational style. Sequestering Hoffman and those with him in a small zone away from the festival demeans them in front of the same people they are trying to reach. The City's policy stopped Hoffman from effectively communicating his message on public streets.

43. Hoffman still wants to communicate his hopeful message about God's love and will at the festival. But the City's policy stops him—if he follows it, he can't effectively speak. If he doesn't follow it, he's been repeatedly told

he'll be arrested. Unconstitutionally stopping Hoffman's speech and religious exercise is an irreparable harm for which Hoffman has no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**

**Violation of the First Amendment: Freedom of Speech**

44. Hoffman incorporates by reference all preceding factual allegations.

45. The First Amendment forbids the government from "abridging the freedom of speech," including by regulating protected speech based on its content, message, or viewpoint. U.S. Const. amend. I. Speech related to matters of religious concern is entitled to even greater—or "doubl[ed]"—protection under the First Amendment. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022) ("That the First Amendment doubly protects religious speech is no accident").

46. Hoffman's religious evangelism, including conversation and leafleting, are protected speech. "[S]preading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as [any other] types." *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 110 (1943).

47. Defendants enforced content-based restrictions on Hoffman's speech in a public forum. They prohibited "religious" speech inside the festival.

48. No legitimate government interest supports excluding religious speech and leafleting from the festival.

49. Defendants' policy and actions are not the least restrictive means of protecting any legitimate government interest. Excluding all religious speech and all leafleting is not narrowly tailored and does not leave open adequate alternative channels of communication. And "allowing permittees unfettered discretion to exclude private citizens on any (or no) basis" is also "not narrowly tailored." *Gathright*, 439 F.3d at 577.

50. Defendants' actions violated Hoffman's right to free speech, prevented him from speaking, and continue to prevent him from speaking at the festival in the future.

**SECOND CLAIM FOR RELIEF**

**Violation of the Arizona Constitution: Free Speech**

51. Hoffman incorporates by reference all preceding factual allegations.

52. The Arizona Constitution guarantees that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Ariz. Const. art. 2, § 6.

53. Hoffman's evangelism is pure speech protected by the Arizona Constitution.

54. Defendants enforced content-based restrictions on Hoffman's speech. They prohibited "religious" speech inside the festival.

55. No legitimate government interest supports excluding religious speech and leafleting from the festival.

56. Defendants' policy and actions were not the least restrictive means of protecting any legitimate government interest.

57. Excluding all religious speech and all leafleting is also not narrowly tailored and does not leave open adequate alternative channels of communication. And "allowing permittees unfettered discretion to exclude private citizens on any (or no) basis" is "not narrowly tailored." *Gathright*, 439 F.3d at 577.

58. Defendants' actions violated Hoffman's right to free speech, prevented him from speaking, and continue to prevent him from speaking at the festival in the future.

**THIRD CLAIM FOR RELIEF**

**Violation of the First Amendment: Free Exercise of Religion**

59. Hoffman incorporates by reference all preceding factual allegations.

60. The First Amendment's Free Exercise Clause restricts the government from "prohibiting the free exercise" of religion. U.S. Const. amend. I. The government may not burden "sincere religious practice" by imposing policies that aren't "'neutral' or 'generally applicable'" unless it "can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525.

61. Hoffman's evangelism is motivated by his sincere religious belief. He believes that Christians should spread the gospel of Jesus Christ to everyone they can.

62. Defendants burdened Hoffman's religious exercise by prohibiting "religious" messages and evangelism on public streets and rights of way inside the open festival, including one-on-one, voluntary conversations and leafleting. By definition, targeting religion for different treatment than other messages is not neutral or generally applicable.

63. No legitimate government interest supports excluding religious messages from the festival.

64. Defendants' policy and actions were not the least restrictive means of protecting any legitimate government interest. Excluding all religious messages is not narrowly tailored. *FCA v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (policy not narrowly tailored where district didn't "consider[ ] less restrictive measures"). And "allowing permittees unfettered discretion to exclude private citizens on any (or no) basis" is "not narrowly tailored." *Gathright*, 439 F.3d at 577.

65. Defendants' actions violated Hoffman's right to free exercise of religion, deterred him from exercising his religion, and continue to deter him from exercising his religion in the future.

## FOURTH CLAIM FOR RELIEF

### Violation of Arizona's Free Exercise of Religion Act: Burden on Free Exercise of Religion

66. Hoffman incorporates by reference all preceding factual allegations.

67. Arizona's Free Exercise of Religion Act provides that "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." Ariz. Rev. Stat. Ann. § 41-1493.01(B). The Act was adopted "to protect Arizona citizens' right to exercise their religious beliefs free from undue governmental interference." *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 918 (Ariz. 2019), *abrogated in other part by Ctr. for Arizona Policy Inc. v. Arizona Sec'y of State*, 592 P.3d 75, 89 (Ariz. 2026); *see also* Ariz. Rev. Stat. Ann. §§ 41-1493–41-1493.04.

68. Hoffman's evangelism is motivated by his sincere religious belief. He believes that Christians should spread the gospel of Jesus Christ to everyone they can.

69. Defendants substantially burdened Hoffman's religious exercise by prohibiting "religious" messages inside the festival.

70. No legitimate government interest supports excluding religious messages from the festival.

71. Defendants' policy and actions were not the least restrictive means of protecting any legitimate government interest. Excluding all religious

messages is not narrowly tailored. *FCA*, 82 F.4th at 694. Nor is "allowing permittees unfettered discretion to exclude private citizens on any (or no) basis." *Gathright*, 439 F.3d at 577.

72. Defendants' actions violated Hoffman's right to free exercise of religion, deterred him from exercising his religion, and continue to deter him from exercising his religion in the future.

73. Hoffman is entitled to "appropriate relief against" defendants for violating the Act. Ariz. Rev. Stat. Ann. § 41-1493.01(D).

## FIFTH CLAIM FOR RELIEF

### Violation of Due Process Clause

74. Hoffman incorporates by reference all preceding factual allegations.

75. The City's policy grants unfettered discretion to private citizen permittees to make decisions about what content is allowed on public streets and ways. This discretion gives Defendants undue opportunity to enforce the policy in an *ad hoc*, arbitrary, and discriminatory manner.

76. Defendants have no compelling or legitimate reason that can justify the unfettered discretion.

77. The policy and Defendants' application of it violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

Hoffman respectfully requests that this Court grant judgment against defendants and order the following relief:

1. Declare that the City's policy violates Hoffman's right to free speech under the First Amendment to the U.S. Constitution.

2. Declare that the City's policy violates Hoffman's right to free speech under the Arizona Constitution.

3. Declare that the City's policy violates Hoffman's right to free exercise of religion under the First Amendment to the U.S. Constitution.

4. Declare that the City's policy violates Arizona's Free Exercise of Religion Act.

5. Declare that the City's policy violates the Due Process Clause of the Fourteenth Amendment.

6. Grant a preliminary and permanent injunction enjoining the City, its agents, officials, servants, employees, and all persons in active concert or participation with it from applying the City's policy to Hoffman.

7. Grant a preliminary and permanent injunction enjoining the City, its agents, officials, servants, employees, and all persons in active

concert or participation with it from applying the City's policy to restrict protected speech in a traditional public forum.

8. Award Hoffman nominal damages for the past violations of his constitutional rights.

9. Award Hoffman his costs and attorney's fees for this lawsuit under 42 U.S.C. § 1988, Arizona's Free Exercise of Religion Act, Ariz. Rev. Stat. Ann. § 41-1493.01(D), and any other applicable provision of law.

10. Award Hoffman pre- and post-judgment interest.

11. Grant Hoffman any other relief to which he is entitled.

12. Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Dated: October 2, 2026

Respectfully submitted,

/s/ *Andrew W. Gould*
Andrew W. Gould
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2575 East Camelback Road, Suite 860
Phoenix, Arizona 85016
Telephone: (602) 388-1262
State Bar No. 013234
*agould@holtzmanvogel.com*

/s/ *Allyson N. Ho*
Allyson N. Ho *(pro hac vice pending)*
Matthew Scorcio *(pro hac vice pending)*
Robert Frey *(pro hac vice pending)*
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
*aho@gibsondunn.com*
*mscorcio@gibsondunn.com*
*rfrey@gibsondunn.com*

Nathan W. Kellum *(pro hac vice pending)*
FIRST LIBERTY INSTITUTE
699 Oakleaf Office Lane, Suite 107
Memphis, Tennessee 38117
Telephone: (901) 684-5485
*nkellum@firstliberty.org*

David J. Hacker *(pro hac vice pending)*
William G. Bell *(pro hac vice pending)*
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: (972) 941-4444
*dhacker@firstliberty.org*
*gbell@firstliberty.org*

*Attorneys for Plaintiff*